UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

In Re: John Thomas Fruitticher, Jr.,

Debtor.
_____

John Thomas Fruitticher, Jr.,

    Defendant / Appellant,

v.                                      Case No: 3:18-cv-1326-JA-EMT

Beach Community Bank,         Bankr. Ct. Case No: 15-30421-KKS
                                          Adv. Proc. No: 15-03015-HAC

    Plaintiff / Appellee.
_____

# OPINION

Beach Community Bank (Beach) initiated an adversary proceeding in bankruptcy court challenging John Thomas Fruitticher, Jr.'s requested discharge of his debts in his Chapter 7 bankruptcy case. Finding Fruitticher had transferred assets with intent to hinder, delay, or defraud his creditors, the bankruptcy court granted summary judgment to Beach and denied Fruitticher a discharge of his debts. Fruitticher now appeals that ruling.[1] Upon careful review, this Court concludes that because there was a genuine issue of material fact regarding Fruitticher's intent, the bankruptcy court erred in granting summary judgment and the order must be reversed.

I.    **Background**

Fruitticher is a real estate appraiser in northwest Florida, and he is married to Celinda Fruitticher (Celinda). (Opening Br. at 5). Like many, Fruitticher enjoyed much

---

[1] The Court has jurisdiction under 28 U.S.C. § 158(a)(1).

success in the early 2000s as the real estate market boomed. (Id.). Though they originally kept their business interests separate, Fruitticher and Celinda owned a number of rental properties together. (Id.). In 2003, the couple formed two trusts: the Celinda Nicholas Fruitticher Revocable Trust (Celinda Trust) and the John Thomas Fruitticher Jr. Revocable Trust (Fruitticher Trust). (See Fruitticher Rule 2004 Examination (Rule 2004 Exam), Doc. 5 at 119).[2] Fruitticher and Celinda are co-trustees of both trusts, and Fruitticher is a beneficiary of both trusts. (See Opening Br. at 5–6; see also Rule 2004 Exam, Doc. 5 at 115). In 2005, Fruitticher and Celinda transferred ownership of the rental properties to the two trusts, 50% to each. (See Opening Br. at 5; see also Fruitticher Aff., Doc. 6 at 33; Doc. 1-3 at 2). From that point until 2008 or 2009, Fruitticher deposited the income from the rental properties (Rental Income) into the couple's personal checking account (Personal Account). (See Rule 2004 Exam, Doc. 5 at 122).

In early 2010, Vision Bank, which is not a party to this action, garnished the Personal Account.[3] (See Rule 2004 Exam, Doc. 5 at 119; see also Opening Br. at 6). After the garnishment, Fruitticher opened a checking account (Checking Account) in the name of the Celinda Trust to pay his bills and cover his expenses. Until that point, the Celinda Trust had operated without a bank account. (Rule 2004 Exam, Doc. 5 at 119). Importantly, at his Rule 2004 Exam, Fruitticher admitted under oath that he opened the Checking Account "so that [he] could use that account as opposed to the one that was

---

[2] Federal Rule of Bankruptcy Procedure 2004 permits a court, on motion of any party of interest, to permit the examination of any entity relating to any matter that may affect the administration of the debtor's estate or the debtor's right to a discharge. See Fed. R. Bankr. P. 2004.

[3] A state court dissolved that garnishment in April 2010. (See Opening Br. at 7).

2

garnished[.]" (Id.). The following exchange from the Rule 2004 Exam is illustrative of Fruitticher's candor on this topic:

> Q: Okay. But you started using the Celinda Fruitticher Trust because Vision Bank garnished —
>
> A: Right.
>
> Q: — your individual account?
>
> A: That's right.
>
> Q: And you did that so that they couldn't—them or any other creditor—couldn't garnish your individual account and get to your money anymore?
>
> A: Yes, that's right.

(Id. at 127).

After opening the Checking Account, Fruitticher discontinued use of the Personal Account. (See id. at 120 ("Well, I hadn't used [the Personal Account] for the past—pretty much since it was garnished, but I am about to start using it again . . . and the only reason I will be using it is for gas or whatever emergency kind of thing I might need.")). At his deposition, Fruitticher testified that he continued using the Checking Account— even after the garnishment of the Personal Account was lifted—because he had already set up the Checking Account:

> Q: So when you put the new account that you opened in the name of your wife's trust, was that to keep the money away from valid debts, or was it to keep a wrongful garnishment from messing up your finances again?
>
> A: It really wasn't either. This was right around when banking kind of changed. The—when we set up that new account, the trust account, we were able to pay directly from that account to whoever we needed to send bills to—or not bills, but payment for bills, and we set all that up in the trust account. And then once the garnishment was removed, we had all that already set up there, so it just made sense to keep paying bills through there.

(Fruitticher Dep., Doc. 6 at 128–29).

Since opening the Checking Account, Fruitticher has deposited the entirety of the Rental Income—even though half of it belongs to the Fruitticher Trust—into the Checking

3

Account. (See Rule 2004 Exam, Doc. 5 at 122–23). Additionally, Fruitticher deposits his monthly employment income (Employment Income) into the Checking Account. (Id. at 125–26). When asked why he deposits his personal employment income into the Checking Account, Fruitticher said: "Well, after Vision Bank garnished the [Personal Account], we just kind of stopped using it, so—and we primarily use the [Checking Account]." (Id. at 126). Fruitticher also often transfers money to the Checking Account from an account at Charter Bank. The funds transferred from Charter Bank (Personal Monies) are usually comprised of a mix of Fruitticher's Employment Income and checks from third parties. (See Answer Br. at 5). Fruitticher deposits these Personal Monies into the Charter Bank account to protect himself from overdraft issues and then transfers nearly all of that money to the Checking Account.[4] (See Rule 2004 Exam, Doc. 5 at 126).

In the adversary proceeding, Beach objected to Fruitticher receiving a discharge, asserting, among other things, that in the year preceding the filing of the Chapter 7

---

[4] Fruitticher described the process as follows:

> Q: [Y]our [employment] checks that you get would vary based on fees, those go into the [Checking Account] . . . ?
>
> A: Sometimes. Again, when Charter Bank is low, I will deposit it into the Charter Bank first and leave some money in there and put the rest into [the Checking Account] from a check from Charter Bank.
>
> Q: When you put the rest in there, do you do that immediately? Is it one of those things where—is that a yes?
>
> A: Yes.
>
> Q: So like if you had a hundred dollar check payable to Mr. Fruitticher, Tom Fruitticher, you would go deposit that into your Charter account to put some money in there and then cut a check for the majority of it back to the [Checking Account] . . . ?
>
> A: That's right.

(Rule 2004 Exam, Doc. 5 at 193–94).

4

petition, Fruitticher transferred into the Celinda Trust Checking Account: (1) $22,100.00 in Rental Income; (2) $26,633.06 in Employment Income; and (3) $9,950.00 in Personal Monies. (Answer Br. at 5; see also Doc. 3-22). Beach claimed that Fruitticher transferred all of these funds with the intent to hinder, delay, or defraud his creditors in violation of 11 U.S.C. § 727(a)(2)(A). (See id. at 19–20). Beach ultimately moved for partial summary judgment[5] on its objection under 11 U.S.C. § 727(a)(2)(A), (see Doc. 5 at 76–98), which Fruitticher opposed, (see Doc. 6 at 14–31). Fruitticher claims that all of the aforementioned funds are exempt from inclusion in his bankruptcy estate under various state-law exemptions and that the transfer of these funds did not violate § 727(a)(2)(A). (See Opening Br. at 16).

The bankruptcy court granted Beach's motion for partial summary judgment on its § 727(a)(2)(A) objection, finding that Fruitticher's own words showed that he transferred his Rental Income, Employment Income, and Personal Monies into the Checking Account with the intent to hinder or delay his creditors. (See Doc. 1-3 at 7 ("Viewing the evidence in the light most favorable to the debtor, he may not have had a fraudulent intent, but there is still no genuine issue of material fact that he made the transfers at issue with the intent to hinder or delay creditors—he has admitted as much.")). At Beach's request, the bankruptcy court dismissed without prejudice the remaining counts in Beach's Complaint. (See id.). This appeal followed.

---

[5] Beach objected to Fruitticher's discharge on several grounds. Beach's motion for summary judgment on the § 727(a)(2)(A) claim was thus styled as a motion for partial summary judgment. After the bankruptcy court granted Beach's motion for partial summary judgment on the § 727(a)(2)(A) claim, Beach agreed to dismiss the other claims in its Complaint. Thus, the § 727(a)(2)(A) claim is the only claim at issue on appeal.

5

## II. Standard of Review

"Quite simply, our law is, and has been, that a summary judgment ruling is reviewed *de novo*." Gray v. Manklow (In re Optical Techs., Inc.), 246 F.3d 1332, 1335 (11th Cir. 2001). This standard of review is employed by both district courts and appellate courts when they review bankruptcy court decisions on motions for summary judgment. See id. ("[W]e take this opportunity to make clear that both the district court and this [c]ourt review a bankruptcy court's entry of summary judgment *de novo*.").

In conducting *de novo* review, this Court applies the familiar summary judgment standard. "Under [Federal Rule of Civil Procedure] 56(c), made applicable to adversary proceedings and contested matters in bankruptcy cases by [Federal Rules of Bankruptcy Procedure] 7056 and 9014, summary judgment is proper if [the evidence] . . . show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. at 1334 (internal quotation marks and citations omitted). In making this determination, the Court must "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Id. (internal quotation marks and citation omitted) At bottom, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. Discussion

### A. The Bankruptcy Court's Legal Conclusions Comport with Relevant Precedent and Statutory Text

The statute under which Beach objected to Fruitticher's discharge provides, in relevant part, that "[t]he court shall grant the debtor a discharge, unless . . . the debtor,

6

with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). Consequently, to successfully object to a discharge under § 727(a)(2)(A), Beach must "prove by a preponderance of the evidence that: (1) a transfer occurred; (2) the transfer was of debtor's property; (3) the transfer was within one year of the petition[;] and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee." Shappell's Inc. v. Perry (In re Perry), 252 B.R. 541, 547 (Bankr. M.D. Fla. 2000); see also Jennings v. Maxfield (In re Jennings), 533 F.3d 1333, 1339 (11th Cir. 2008). As the bankruptcy court noted, only "the second and fourth elements are disputed here." (Doc. 1-3 at 4).

To rule on Beach's motion, the bankruptcy court had to make two important legal determinations. First, it had to interpret the meaning of the phrase "intent to hinder, delay, or defraud" in 11 U.S.C. § 727(a)(2). Second, the bankruptcy court had to determine whether "property of the debtor," as used in 11 U.S.C. § 727(a)(2)(A), includes property that is exempt from inclusion in the bankruptcy estate. The bankruptcy court interpreted both statutory phrases in accordance with their plain meanings. As discussed below, these interpretations faithfully follow relevant precedent and the statutory text, though affirming these determinations is not necessary to resolve this appeal.

   1.   *Intent to Hinder, Delay, or Defraud*

In interpreting the phrase "intent to hinder, delay, or defraud" as used in § 727(a)(2), the bankruptcy court held that an intent to either hinder, delay, or defraud suffices. (See Doc. 1-3 at 7). Beach agrees with this interpretation. (See Answer Br. at 15). Fruitticher,

7

however, argues that the phrase "hinder, delay, or defraud" requires fraud—a meaning that Fruitticher contends dates back to the Statute of 13 Elizabeth. (See Opening Br. at 23). In support of this argument, Fruitticher cites Coder v. Arts, 213 U.S. 223 (1909), a case in which the Supreme Court considered whether a certain conveyance was fraudulent and therefore voidable. In considering the issue, the Coder Court remarked:

> What is meant when it is required that such conveyances, in order to be set aside, shall be made with the intent on the bankrupt's part to hinder, delay, or defraud creditors? This form of expression is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud . . . .

Id. at 242. Fruitticher maintains that Congress drafted § 727(a)(2) with this Supreme Court precedent in mind, but the meaning of this statutory phrase is an open question in the Eleventh Circuit. See In re Jennings, 533 F.3d at 1341 n.5 ("Since we have determined that the record evidence supports a finding that Jennings intended to defraud his creditors, we express no opinion as to whether the discharge would have been proper if Jennings had intended only to hinder or delay his creditors.").

This Court begins, as it must, with the plain language of the statute. The plain language of § 727(a)(2) is not ambiguous—it requires that a debtor have the intent to "hinder, delay, *or* defraud" a creditor. 11 U.S.C. § 727(a)(2) (emphasis added). Numerous courts have recognized that the disjunctive phrasing of the statutory language clearly indicates that an intent to either hinder, delay, or defraud suffices. See, e.g., Retz v. Samson (In re Retz), 606 F.3d 1189, 1200 (9th Cir. 2010) ("A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). Because the language of the statute is in the disjunctive[,] it is sufficient if the debtor's intent is to hinder or delay a creditor."); Smiley v. First Nat'l Bank of Belleville (In re Smiley), 864 F.2d 562, 568 (7th Cir. 1989)

("[The debtor's] discharge must be denied pursuant to Section 727 because it is clear that he intended to hinder or delay his creditors, even if he had no intent to defraud them." (citation omitted)).

Additionally, the Supreme Court has not steadfastly maintained that the phrase "hinder, delay, or defraud" always requires a showing of actual fraud. For example, in Shapiro v. Wilgus, 287 U.S. 348 (1932), the Court said just the opposite:

> In this approval of a purpose which has been condemned in Anglo-American law since the Statute of Elizabeth (13 [E]liz. c. 5), there is a misconception of the privileges and liberties vouchsafed to an embarrassed debtor. A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. The belief even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay. This . . . is true under the Statute of Elizabeth (13 Eliz. c. 5) . . . .

Id. at 354 (internal citations omitted).

The conflicting Supreme Court interpretations undercut Fruitticher's argument that the phrase is a legal term of art with a well-defined meaning. Rather, Congress chose to use the disjunctive, which means that each word in the phrase should be given meaning. This also comports with the well-known canon of statutory construction directing courts to avoid readings of statutes that render words or phrases superfluous. See Duncan v. Walker, 533 U.S. 167, 174 (2001) (noting that it is the duty of the courts to "give effect, if possible, to every clause and word of a statute" (internal quotation marks and citation omitted)). Fruitticher's reading of the statute would completely divest the words "hinder" and "delay" of any meaning or purpose. Cf. Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1590 (2016) ("Ritz asks us, in other words, to ignore what he believes is Congress' imprudent use of the word 'or' and read the final item in the list to modify and limit the

others. In essence, he asks us to change the word 'or' to 'by.' That is an argument that defeats itself. We can think of no other example . . . in which this Court has attempted such an unusual statutory modification.").

Moreover, six circuit courts have read the statute in accordance with its plain meaning. See Wiggains v. Reed (In re Wiggains), 848 F.3d 655, 661 (5th Cir. 2017) ("We find relevant meaning in the fact that the phrase is stated in the disjunctive, which signifies that an intent to hinder or to delay or to defraud is sufficient." (footnote omitted)); Rupp v. Pearson, 658 F. App'x 446, 450 (10th Cir. 2016) ("Under the statute authorizing dismissals of bankruptcy petitions, it is enough to show actions taken with intent to 'hinder or delay creditors.'"); In re Retz, 606 F.3d at 1200 (holding that "[b]ecause the language of the statute is in the disjunctive[,] it is sufficient if the debtor's intent is to hinder or delay a creditor"); Sholdan v. Dietz, 108 F.3d 886, 888 (8th Cir. 1997) ("[W]e do not mean to say that the test of 'hinder or delay' might not prevail under another set of facts. In this case, however, the facts do not support such a finding."); Bank of Bartlett v. Nichols (In re Nichols), 47 F.3d 1170 (Table), 1995 WL 80213, at *2 (6th Cir. Feb. 24, 1995) ("We agree that § 727 is clearly disjunctive, so the Bank must prove only an intent to hinder, or an intent to delay, or an intent to defraud."); In re Smiley, 864 F.2d at 568 (holding that the debtor's discharge "must be denied pursuant to Section 727 because it is clear that he intended to hinder or delay his creditors, even if he had no intent to defraud them").

Finally, Fruitticher argues in his opening brief that the Eleventh Circuit construes the phrase "hinder, delay, or defraud" as requiring some demonstration of actual fraudulent intent. (Opening Br. at 24). But Fruitticher stretches Eleventh Circuit authority too far. In the case he relies upon, the Eleventh Circuit did not hold that a creditor

10

objecting to a discharge under § 727(a)(2) must always show fraudulent intent. Rather, the court said that a "creditor alleging intent to defraud under § 727(a)(2)(A) bears the considerable burden of demonstrating *actual fraudulent intent*; constructive fraud is insufficient." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 306 (11th Cir. 1994) (emphasis in original) (citation omitted). That holding merely clarifies that when an objecting creditor alleges an intent to defraud, that creditor must show actual fraudulent intent as opposed to constructive fraudulent intent. That does not mean that a creditor alleging an intent to hinder or delay must also show fraud.

As demonstrated above, relevant precedent and the statutory text support the bankruptcy court's interpretation of the phrase "intent to hinder, delay, or defraud."

### 2. Property of the Debtor

Section 727(a)(2)(A) explicitly provides that a debtor can be denied a discharge if, with the intent to hinder, delay, or defraud a creditor, he transfers "property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). Despite the clarity of the statutory text, some courts have grafted an additional requirement onto this provision of the statute—a so-called "property of the estate" requirement that mandates that the transferred property be non-exempt. Courts following this approach reason that because property exempt from the bankruptcy estate is beyond the reach of creditors, a debtor cannot form the intent to hinder, delay, or defraud creditors by transferring that exempt property. See Syngenta Seeds, Inc. v. Wingate (In re Wingate), 332 B.R. 649, 654 (Bankr. M.D. Fla. 2005) ("Disposition of exempt property does not establish an intent to defraud creditors since creditors do not have a claim against the exempt property originally."); see also Lee Supply Corp. v. Agnew (In re Agnew), 818 F.2d 1284, 1290 (7th Cir. 1987) (noting that a debtor's transfer "was not a transfer with actual

11

intent to defraud . . . because [the creditor] could never have had a claim to the asset in the first place" as it was exempt from inclusion in the bankruptcy estate).

Other courts, however, conclude that the plain meaning of § 727(a)(2)(A) precludes the addition of this "property of the estate" requirement. See McAfee v. Harman (In re Harman), No. 11-5534, 2014 WL 5359708, at *6 (Bankr. N.D. Ga. Sept. 11, 2014) ("[N]othing in the statute requires that the funds be property of the bankruptcy estate; indeed, § 727(a)(2) explicitly applies where [the] [d]ebtor transferred property of *either* [the] [d]ebtor *or* the bankruptcy estate." (emphasis in original)); see also Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281–82 (9th Cir. 1996) ("[A] debtor need not succeed in harming creditors to warrant denial of discharge because 'lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy.'" (quoting First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986))). The bankruptcy court here followed this latter approach.

The bankruptcy court's conclusion that the transfer of exempt property can evidence intent to hinder, delay, or defraud creditors is in line with Eleventh Circuit precedent and the statutory text. First, Eleventh Circuit precedent suggests that this is the proper result. In Davis v. Davis (In re Davis), 911 F.2d 560 (11th Cir. 1990), the debtor argued that the bankruptcy court erred in denying him a discharge because the property he transferred to his wife did not reduce the value of the assets available to his creditors. Id. at 561. The Eleventh Circuit rejected this argument, holding that injury to creditors is irrelevant to a § 727(a)(2)(A) claim. See id. In so holding, the court cited favorably to Future Time, Inc. v. Yates, 26 B.R. 1006 (M.D. Ga. 1983), aff'd mem., 712 F.2d 1417 (11th Cir. 1983), which reasoned: "When appellant transferred his interest in the residence to his wife, he obviously intended to shield what he thought was valuable property from the claims of his creditors.

12

To hold now that there occurred no transfer of property with the intent to hinder creditors merely because the debts on the residence exceeded its estimated fair market value would be to reward appellant for his wrongdoing, which the court refuses to do." In re Davis, 911 F.2d at 562 (quoting Future Time, Inc., 26 B.R. at 1009). The Eleventh Circuit also cited favorably to the Ninth Circuit's decision in In re Adeeb, which held that injury to creditors is irrelevant for § 727(a)(2)(A) purposes. See id. at 561 n.2. Thus, while the Eleventh Circuit has never explicitly held that a debtor can have the intent to hinder, delay, or defraud his creditors when he transfers exempt assets, case law holding that the value of the transferred asset is irrelevant for § 727(a)(2)(A) purposes supports the interpretation that a debtor can have the requisite intent when he transfers exempt property.

Second, the statutory construction of § 727(a)(2) as a whole corroborates this interpretation of the provision. As noted above, § 727(a)(2)(A) imposes only a single requirement on the type of property transferred before filing a bankruptcy petition—"*property of the debtor*, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A) (emphasis added). However, § 727(a)(2)(B), governing post-petition transfers, provides that a discharge can be denied if a debtor, with the intent to hinder, delay, or defraud a creditor, transfers "*property of the estate*, after the date of the filing of the petition." Id. § 727(a)(2)(B) (emphasis added).

These parallel provisions demonstrate that Congress knows how to put a limit on the type of transferred property to which § 727(a)(2) applies. If Congress so desired, it could have written § 727(a)(2)(A) to require that property transferred pre-petition be property that would become part of the bankruptcy estate. But Congress did not write § 727(a)(2)(A) in this manner; Congress wrote "property of the debtor." Id. § 727(a)(2)(A). In so doing, Congress explicitly broadened § 727(a)(2)(A) to include more than just

property that would become part of the bankruptcy estate. The result is clear: If a debtor transfers *any* of his property—regardless of its value or exemption status—with the intent to hinder, delay, or defraud a creditor in the year before filing a bankruptcy petition, § 727(a)(2)(A) bars that debtor from obtaining a discharge. This interpretation is also consistent with the underlying purpose of the statute, which focuses on the intent of the debtor, not the result of the debtor's actions.

Accordingly, relevant precedent and the statutory text support the bankruptcy court's interpretation of § 727(a)(2)(A). Again, however, this Court need not affirm either of the bankruptcy court's legal rulings to resolve this appeal. As discussed below, a genuine dispute of material fact exists under either construction of § 727(a)(2). The Court will thus resolve the case on that basis.

### B. A Genuine Dispute of Material Fact Regarding Fruitticher's Intent Precludes Summary Judgment

A genuine dispute of material fact regarding Fruitticher's intent precludes summary judgment in this case. The bankruptcy court concluded that Fruitticher's own testimony established that he had transferred his funds with the intent to hinder, delay, or defraud his creditors. Consequently, the bankruptcy court granted Beach's motion for partial summary judgment and denied Fruitticher a discharge of his debt. This was error. The summary judgment standard requires that facts and inferences be drawn in favor of the non-moving party. See Raney v. Aware Woman Ctr. for Choice, Inc., 224 F.3d 1266, 1268 (11th Cir. 2000). Evaluating the facts in light of this requirement, the question of Fruitticher's intent must be left for resolution by the factfinder.

After interpreting § 727(a)(2)(A) as discussed above, the bankruptcy court's formulation of the law was as follows: When a debtor transfers property in the year

14

preceding his filing for bankruptcy, § 727(a)(2)(A) permits a creditor to successfully object to discharge if the debtor transferred any of his property—regardless of its exemption status—with the intent to either hinder, delay, or defraud a creditor or an officer of the estate. Applying that law to the facts, the bankruptcy court then found that Fruitticher's own testimony revealed that he transferred his Rental Income, Employment Income, and Personal Monies[6] into the Checking Account to frustrate a garnishment attempt by his creditors. (See Doc. 1-3 at 7). The bankruptcy court relied on Fruitticher's testimony, which it characterized as an admission by Fruitticher that "he put the funds into the [Checking Account] to keep creditors from attempting to garnish them." (Id.). The bankruptcy court found that Fruitticher's statements regarding his purpose for making transfers into the Checking Account—regardless of the exemption status of the funds[7]—showed that Fruitticher had the intent to hinder or delay his creditors. (See id. at 7–8).

Under either interpretation of § 727(a)(2)(A)—the one urged by Fruitticher or the one applied by the bankruptcy court—a genuine dispute of material fact precludes summary judgment. Fruitticher's formulation of the law would require an objecting creditor to show that the debtor had the actual intent to defraud a creditor when he transferred his non-exempt property in the year preceding his filing of a bankruptcy petition. And the bankruptcy court acknowledged that it could not determine at the

---

[6] Fruitticher argued that the funds he transferred were not his property but instead belonged to the Celinda Trust. Not so. While there is a colorable argument that the Rental Income was trust property, there can be no dispute that Fruitticher's Employment Income and Personal Monies were his property. That Fruitticher deposited his Employment Income and Personal Monies into the Checking Account does not change the fact that those funds were his property for purposes of § 727(a)(2)(A).

[7] The bankruptcy court declined to rule on whether any of Fruitticher's property was actually exempt from the bankruptcy estate because it held that the transfer of either exempt or non-exempt property could violate § 727(a)(2)(A). (See Doc. 1-3 at 6–7).

summary judgment stage if Fruitticher had the actual intent to defraud. (See id. at 7 ("Viewing the evidence in the light most favorable to [Fruitticher], he may not have had a fraudulent intent . . . .")). Under Beach and the bankruptcy court's formulation of the law, an objecting creditor would have to show that the debtor had the intent to either hinder, delay, or defraud a creditor when he transferred any of his property—exempt or not—in the year preceding the filing of his bankruptcy petition. As discussed below, even under this latter reading of the statute, a disputed issue of material fact precludes summary judgment in Beach's favor.

The bankruptcy court relied on the following testimony to find that Fruitticher had the intent to hinder or delay his creditors when he deposited his Rental Income, Employment Income, and Personal Monies into the Checking Account:

> Q: So I just want to make sure I understand. The trust, the Celinda Fruitticher Trust was formed in 2003. It doesn't have a bank account, all the way until 2008, 2009, somewhere in that time frame?
>
> A: That's right.
>
> Q: So somewhere in that time frame, Vision Bank garnished [the Personal Account] that you had . . . in your individual name?
>
> A: That's right.
>
> Q: And then you decided to open up the [Checking Account] . . . so that you could use that account as opposed to the one that was garnished?
>
> A: That's right.
>
> Q: Do you still have [the Personal Account] in your name?
>
> A: I do.
>
> Q: Is that an account you still use?
>
> A: Well, I hadn't used it for the past—pretty much since it was garnished, but I am about to start using it again . . . .

(Rule 2004 Exam, Doc. 5 at 119–20).

> Q: Okay. But you started using the Celinda Fruitticher Trust because Vision Bank garnished —
>
> A: Right.

> Q: — your individual account?
>
> A: That's right.
>
> Q: And you did that so that they couldn't—them or any other creditor—couldn't garnish your individual account and get to your money anymore?
>
> A: Yes, that's right.

(Id. at 127).

Though this testimony reveals that Fruitticher had a questionable intent when he opened the Checking Account, it does not necessarily establish that Fruitticher had the requisite intent to hinder or delay his creditors when he made the transfers in the year preceding his bankruptcy filing. Fruitticher averred that he formed and began using the Checking Account because of a garnishment by Vision Bank. (See id. at 119). While Fruitticher acknowledged that he *began* using the Checking Account to avoid the Vision Bank—and other—garnishments, that was in 2008 or 2009. (See id.). And the Vision Bank garnishment lasted only two to three months. (See Opening Br. at 6–7). Fruitticher further testified that he continued using the Checking Account after the garnishment on the Personal Account was lifted because he had already started using the Checking Account to pay his bills and expenses. (See Fruitticher Dep., Doc. 6 at 128–29).

There is no record evidence that Fruitticher ever stated that he used the Checking Account after April 15, 2014—the date one year before he filed for bankruptcy—to attempt to avoid garnishment by one of his creditors. Additionally, Fruitticher's disclosure of the existence of the trusts to Beach tends to show that he was not using those trusts to hide money from his creditors. (See Fruitticher Aff., Doc. 6 at 34).

The question of intent is an intensely fact-specific inquiry, which is why it is generally not decided at the summary judgment stage. See Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1476 (11th Cir. 1991) ("As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder,

to be determined after trial." (citation omitted)); see also In re Miller, 39 F.3d at 307. Without uncontroverted testimony or other evidence that indicates Fruitticher transferred funds into the Checking Account at some point between April 15, 2014, and April 15, 2015, for the purpose of hindering or delaying his creditors, the Court cannot conclude—at the summary judgment stage—that Fruitticher had the intent to hinder or delay his creditors.[8]

To be sure, the Court could certainly draw the inference that Fruitticher continued using the Checking Account for its initial purpose—avoiding creditors. Perhaps that is even the most logical inference in light of Fruitticher's several bad experiences regarding garnishments. But the Court could also draw the opposite inference. When, as here, a Court can draw multiple sets of inferences from the facts, summary judgment is not appropriate. See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." (citation omitted)). On remand, the bankruptcy court could still certainly conclude—after considering the totality of the evidence and evaluating the credibility of the witnesses at trial—that Fruitticher had the intent to hinder or delay his creditors in the year preceding his filing for bankruptcy. But the bankruptcy court's finding of such intent at this stage of the case and based on the present record was premature.

---

[8] Beach also noted at oral argument that it can prevail on its motion for partial summary judgment even without Fruitticher's allegedly damning testimony because certain "badges of fraud" allow the Court to infer Fruitticher's nefarious intent. This approach is often used because courts recognize that "direct evidence of fraudulent intent is rarely available," Addison v. Seaver (In re Addison), 540 F.3d 805, 811 (8th Cir. 2008), and it involves courts looking to certain "badges of fraud" to determine if the circumstances permit an inference of fraudulent intent. Here, the record evidence does not permit the Court to infer a nefarious intent using the "badges of fraud."

Accordingly, under either interpretation of § 727(a)(2)(A), a genuine dispute of material fact exists regarding Fruitticher's intent. The facts, construed in the light most favorable to Fruitticher, do not establish that Fruitticher's deposits of his Rental Income, Employment Income, and Personal Monies into the Checking Account in the year preceding his filing for bankruptcy were done with an intent to hinder, delay, or defraud his creditors. Beach is therefore not entitled to summary judgment on its claim under 11 U.S.C. § 727(a)(2)(A), and the bankruptcy court erred in granting Beach's motion for partial summary judgment.

## IV. Conclusion

In light of the foregoing, the bankruptcy court's decision granting Beach's Motion for Partial Summary Judgment is **REVERSED**, and this case is remanded to the bankruptcy court for further proceedings consistent with this opinion. The Clerk of the Court is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida, on March 7, 2019.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties